**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: BPS DIRECT LLC, AND CAEBELA'S LLC, WIRETAPPING LITIGATION | MDL NO. 3074<br><br>E.D. Pa. Action Nos.:<br>2:23-md-3074-MAK<br>23-cv-2282<br>23-cv-2294 |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Heather Cornell and Peter Montecalvo (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, hereby file this second consolidated amended class action complaint against Defendants BPS Direct, LLC, d/b/a Bass Pro Shops ("BPS") and Cabela's LLC ("Cabela's") (collectively, "Defendants"), and in support thereof allege the following:

## INTRODUCTION

1.      This is a class action brought against Defendants for the wiretapping of electronic communications of visitors to Defendants' websites, www.basspro.com and www.cabelas.com ("Defendants' Websites"), and all of Defendants' Websites' subpages. Defendants procure various third-party vendors, including Microsoft Corporation ("Microsoft"), Quantum Metric, and Mouseflow to embed snippets of JavaScript computer code ("Session Replay Code") on Defendants' Websites, which then deploys on each website visitor's internet browser for the purpose of intercepting and recording the website visitor's electronic communications with Defendants' Websites (*i.e.*, computer to computer data communications), including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box, both intentional and unintentional), URLs of web pages visited, purchase-based communications, and/or other electronic communications in real-time (collectively, "Website Communications").

The Session Replay Code procured by Defendants surreptitiously and instantaneously intercepted, stored, and recorded everything Plaintiffs and the Class Members did on Defendants' Websites, *e.g.*, what they searched for, what they looked at, the information they inputted, and what they clicked on for the entire duration of their visit.

2. These third-party vendors, such as Microsoft, Quantum Metric, Mouseflow, and others (collectively, "Session Replay Providers") create and deploy the Session Replay Code at Defendants' request, and capture and store the Website Communications of each website visitor.

3. After intercepting and capturing the Website Communications, Defendants' and the Session Replay Providers can use those Website Communications to recreate website visitors' entire visit to Defendants' Websites. The Session Replay Providers can create, using the swaths of website users' data they collect from users' browsing sessions and browsing devices, a video replay of the user's behavior on the websites and provide it to BPS or Cabela's, respectively, for analysis. Defendants' procurement of the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to Defendants' Websites for the entire duration of their interaction with the websites.

4. Defendants knowingly, willfully, and intentionally procured the interception of, and used, the electronic communications at issue without the knowledge or prior consent of Plaintiffs or the Class Members. Defendants did so for their own financial gain and in violation of Plaintiffs' and the Class Members' substantive legal privacy rights under the various wiretapping laws and other state statutes and the common law.

5. The Session Replay Code utilized by Defendants is not a traditional website cookie, tag, web beacon, or analytics tool. It is a sophisticated computer software that allows Session

Replay Providers to contemporaneously intercept, capture, read, observe, re-route, forward, redirect, and receive incoming electronic communications to Defendants' Websites.

6.     The CEO of a major Session Replay Provider – while discussing the merger of his company with another Session Replay Provider – publicly exposed why companies like Defendants employ the use of Session Replay Code on their websites: "The combination of Clicktale and Contentsquare heralds an unprecedented goldmine of digital data that enables companies to interpret and predict the impact of any digital element -- including user experience, content, price, reviews and product -- on visitor behavior[.]"[1] This CEO further admitted that "this unique data can be used to activate custom digital experiences in the moment via an ecosystem of over 50 martech partners. With a global community of customers and partners, we are accelerating the interpretation of human behavior online and shaping a future of addictive customer experiences."[2]

7.     Unlike typical website analytics services that provide simple aggregate statistics, the Session Replay Code utilized by Defendants is intended to record and playback individual browsing sessions. The technology also permits companies like Defendants to view the interactions of visitors on their websites in real-time, including capturing partial text field submissions that users did not intend to send to Defendants' (for example, by closing the browser before hitting "submit"), and certainly did not intend to send to third-party Session Replay Providers.

---

[1]     *See Contentsquare Acquires Clicktale to Create the Definite Global Leader in Experience Analytics*, PR Newswire (July 1, 2019), *available at* www.prnewswire.com/news-releases/contentsquare-acquires-clicktale-to-create-the-definitive-global-leader-in-experience-analytics-300878232.html (last accessed July 15, 2026).

[2]     *Id.*

8. Defendants' conduct violates the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*, Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, Massachusetts Wiretapping Statute, Mass. Gen. Laws ch. 272 §99(Q), Pennsylvania Wiretap and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. §§ 5701, *et seq.* ("WESCA"), and constitutes an invasion of privacy rights of website visitors under each relevant state's law.

9. Plaintiffs bring this action individually and on behalf of a nationwide class of all natural persons in the United States and in its territories whose Website Communications were intercepted through the use of Session Replay Code embedded on Defendants' Websites (the "Nationwide Class"). Plaintiffs also bring this action on behalf of all natural persons in the states of Massachusetts and Pennsylvania whose Website Communications were intercepted through the use of Session Replay Code embedded on Defendants' Websites (the "State Subclasses," and, collectively with the Nationwide Class, the "Class"). Plaintiffs seek all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, nominal, and/or punitive damages, declaratory and injunctive relief, and attorneys' fees and costs.

## **PARTIES**

10. Plaintiff Heather Cornell is a citizen of the Commonwealth of Pennsylvania, and at all times relevant to this action, resided and was domiciled in Forest County, Pennsylvania. Plaintiff Cornell accessed www.basspro.com while in Pennsylvania.

11. Plaintiff Peter Montecalvo is a citizen of the State of Connecticut, and at all times relevant to this action resided and was domiciled in Middlesex County, Connecticut. Plaintiff Montecalvo accessed www.cabelas.com while in Massachusetts.

12. Defendant BPS is a limited liability company organized under the laws of Delaware, and its principal place of business is in Springfield, Missouri. BPS Direct, LLC is

wholly owned by Bass Pro, LLC.[3] Bass Pro, LLC is a single-member limited liability company organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri.[4] The sole member of Bass Pro, LLC is Huntsman Holdings, LLC, a single-member limited liability company organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri. The members of Huntsman Holdings, LLC are Bass Pro Group, LLC and ASHCo, Inc. Bass Pro Group, LLC is a single-member limited liability company organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri. ASHCo, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri. The sole member of Bass Pro Group, LLC is Bass Pro Holdings, LLC, a single-member limited liability company organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri. Bass Pro Holdings, LLC's sole member is Johnny Morris Outdoors, LLC, a multi-member LLC, with three members. The three members of Johnny Morris Outdoors, LLC are American Sportsman Holdings Co., Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC. American Sportsman Holdings Co. is a corporation organized under the laws of the State of Missouri with its principal place of business in Missouri. Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC are investment companies that provided funding for the Bass Pro acquisition of Cabela's. The members of these two LLCs are unknown to any person employed by any of the

---

[3]    *State Of Delaware, Ex Rel. Kathleen Jennings, Attorney General Of The State Of Delaware, v. Cabela's Inc., et al.*, Case No. 1:23-cv-00790-RGA at ECF No. 3 (Respondents' Corporate Disclosure Statement) (July 24, 2023).

[4]    *See* ECF No. 47 at 3 (stipulated facts).

Bass Pro and TMBC, LLC entities or TMBC, LLC's parent entities.[5] Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC are limited liability companies organized under the laws of the State of Delaware. Upon information and belief, Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC each have individual members that are residents of the Commonwealth of Pennsylvania. Defendant BPS is, thus, a citizen of Missouri and Pennsylvania – and possibly other states.

13.     Defendant Cabela's is a single member limited liability company organized under the laws of Delaware with its principal place of business in Springfield, Missouri. Cabela's LLC is wholly owned by Bass Pro, LLC, which is wholly owned by Huntsman Holdings, LLC. Huntsman Holdings, LLC is an indirect, wholly-owned subsidiary of American Sportsman Holdings Co., a Missouri corporation with its principal place of business at 2500 E. Kearney St., Springfield, Missouri.

14.     The members of Huntsman Holdings, LLC are Bass Pro Group, LLC and ASHCo, Inc. Bass Pro Group, LLC is a single-member limited liability company organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri. ASHCo, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri. *Id.* The sole member of Bass Pro Group, LLC is Bass Pro Holdings, LLC, a single-member limited liability company organized under the laws of the State of Delaware with its principal place of business in Springfield, Missouri. Bass Pro Holdings, LLC's sole member is Johnny Morris Outdoors, LLC, a multi-member LLC, with three members. The three members of Johnny Morris Outdoors, LLC are American Sportsman Holdings Co.,

---

[5]     *See id.* (as to Bass Pro); *see also Hafer v. TMBC, LLC d/b/a Cabela's, et al.*, Case No. 5:20-cv-06371, ECF No. 7 (Defendants TMBC LLC, LLC and Cabela's Wholesale, LLC Disclosure Statement Form as to TMBC, LLC and its parent entities).

Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC. American Sportsman Holdings Co. is a corporation organized under the laws of the State of Missouri with its principal place of business in Missouri. *Id.* Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC are investment companies that provided funding for the Bass Pro acquisition of Cabela's. The members of these two LLCs are unknown to any person employed by any of the Bass Pro and TMBC, LLC entities or TMBC, LLC's parent entities. Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC are limited liability companies organized under the laws of the State of Delaware. Upon information and belief, Outdoor Holdings, LLC and WSCP VII Mockingjay II, LLC each have individual members that are residents of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendants.

16.    This Court has general jurisdiction over BPS pursuant to Pa. C.S.A. § 5301. Specifically, this Court has general jurisdiction over BPS because BPS is an out-of-state business association registered to do business under the laws of the Commonwealth of Pennsylvania since June 16, 2010. As part of registering to do business in the Commonwealth of Pennsylvania, BPS "shall enjoy the same rights and privileges as a domestic entity and shall be subject to the same liabilities, restrictions, duties and penalties . . . imposed on domestic entities." Pa. C.S.A. § 402(d). Among other things, Pennsylvania law is explicit that "qualification as a foreign entity under the laws of [the] Commonwealth" shall permit state courts to "exercise general personal jurisdiction" over a registered foreign partnership, limited partnership, partnership association, profession

7

association, unincorporate association and other similar entities, just as they can over domestic entities. Pa. C.S.A. § 5301. Thus, by registering to do business in the Commonwealth of Pennsylvania and benefiting from the opportunity to do business in the Commonwealth Pennsylvania, BPS has consented to being subject to general jurisdiction in the Commonwealth of Pennsylvania.

17.    In the alternative, this Court has specific personal jurisdiction over Defendants because a substantial part of the events and conduct giving rise to Plaintiffs' claims and harm occurred in the Commonwealths of Pennsylvania and Massachusetts, and throughout the United States. The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed towards citizens throughout the United States. At all relevant times, Defendants knew that their practices would directly result in the collection of information from individuals located within each state of the United States, including but not limited to, Massachusetts and Pennsylvania while those individuals browsed Defendants' Websites. Defendants chose to avail themselves of the business opportunities of marketing, selling and shipping their goods in each state in the United States and specifically in Massachusetts and Pennsylvania, and procuring the interception of real-time data from website visitors' sessions initiated by individuals while located in those places, and the claims alleged herein arise from those activities.

18.    Defendants also knew that many users visit and interact with Defendants' Websites while they are physically present in the United States, and its territories.

19.    Both desktop and mobile versions of Defendants' Websites allow a user to search for nearby stores by providing the user's "current location," as furnished by the location-determining tools of the device the user is using or by the user's IP address (*i.e.*, without requiring

8

the user to manually input an address). Users' employment of automatic location services in this way means that Defendants are continuously made aware that their websites are being visited by people located in the United States and its territories, and that such website visitors are being wiretapped in violation of the federal Wiretap Act, and other state statutes and common laws.

20. Defendants have a physical presence throughout the United States, maintaining one or more brick and mortar stores located in Pennsylvania (1 Bass Pro Shops; 1 Cabela's) and Massachusetts (1 Bass Pro Shops; 1 Cabela's), among other physical sites as reflected in the below map.[6]



21. In addition to the physical retail stores identified above, Defendants have a "robust e-commerce" presence. In particular, Bass Pro and Cabela's each ship products to the 50 States and Territories through Defendants' Websites to respective website visitors whose privacy has been violated as a result of Defendants' purposeful actions towards those States and Territories.[7]

---

[6] *See* "Find a Bass Pro Shops," Bass Pro Shops, https://stores.basspro.com/ (identifying 183 Retail Stores for both Bass Pro and Cabela's and identifying each and every Bass Pro Shops and Cabela's located in the United States) (last accessed July 15, 2026).

[7] *See* "What Will I be Charged for Shipping?," https://help.cabelas.com/shipping-2173594c/what-will-i-be-charged-for-shipping-29271b5c (Shipping Details, Providing for Shipping to the 50 States and Territories) (last accessed July 15, 2026).

22. Additionally, Bass Pro and Cabela's each provide website visitors with the ability to check on their respective websites whether a product is in stock at a particular brick and mortar location. Going a step further, while procuring third parties to track their customers online, Bass Pro and Cabela's each give the website visitors the ability to order products on the website for "In Store Pick Up" at one of the 171 physical retail locations around the United States.

23. Defendants' digital presence targets specific locations with targeted ads specific to the community in which the ad is placed. In fact, according to a Bass Pro Case Study, Joe Gies, Senior Marketing Manager of Creative and Photography Services (at Bass Pro) provides with respect to its "robust e-commerce" that:

> We try very hard to create a one-to-one dialog and presentation to our customers, no matter where they may live or shop," says Joe Gies, Sr. Marketing Manager of Creative and Photography Services (at Bass Pro). [... ] "Digital editions are also uploaded to each store website. These are produced every two weeks and have driven significant sales volume nationwide. Their effectiveness is due in large part to their deliberately customized [sic] regional and demographic appeal. While other retailers typically customize [sic] inserts by price, Bass Pro also customises [sic] each version according to actual customer interests." "You've got a fisherman in South Florida who's fishing for large-mouth bass," Gies says. "He'll be using a specific type of plug or lure—like an orange-colored worm. But we don't want to feature those types of lures to a fisherman in Wisconsin or Michigan who's fishing for northern pike. To have authenticity in our presentation, we always feature products that are relevant to each geography - just as we hire people in our stores that have local knowledge and expertise.[8]

24. This Court has personal jurisdiction over Defendants because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from each of the 50 States, including Massachusetts and Pennsylvania. Defendants procured and embedded Session Replay Code, which it used to allow Session Replay Providers to collect data directly from website visitors in each of the 50 States, violating federal and statutory law as well as common law.

---

[8] *See* Making Personal Connections, COMOSOFT (2018), *available at* https://www.comosoft.eu/case-study-bass-pro-shops/ (last accessed July 15, 2026).

25.     Furthermore, Defendants actively use the data collected by Session Replay Providers in all 50 States to specifically target citizens of each state with marketing and advertising content which results in an increased profit to Defendants at a significant cost to Plaintiffs and Class Members in the form of privacy.

26.     Defendants' decision to place or procure the placement of Session Reply Code to collect the data of nationwide residents of the United States, including Pennsylvania and Massachusetts, is by deliberate and intentional design.

27.     Though Plaintiffs and Class Members do not currently have the ability to do so, if a user chose not to grant Defendants' permission to collect the user data or employ the Session Replay Code on their computers and/or mobile devices, Defendants' profits would be reduced because they would not be able to track Plaintiffs, gather information about them, or push ads which result in profit to Bass Pro and Cabela's.

28.     Defendants' deliberate gathering of the data is intentionally targeted toward citizens, residents, and visitors of each state, including Plaintiffs and the Class, and constitutes purposeful activity directed at individuals and their browsing devices in each of the 50 states, including but not limited to Pennsylvania and Massachusetts.

29.     Defendants' deliberate placement of Session Replay Code on the computers and mobile devices of unwitting browsers in the United States results in a trespass to chattels – i.e., the computers and/or mobile devices and/or the data contained therein; a conversion of chattels – i.e., the computers and/or mobile devices and/or the data contained therein. Given the placement of the Session Replay Code on Defendants' Websites to intercept data from website browsers nationwide, and the use of such intercepted data for specific targeting advertisements and profit,

11

Defendants could not be surprised to be hailed into Pennsylvania or Massachusetts or any other State or Territory.

30. Additionally, Defendants derive substantial revenue from online purchases of visitors whose Website Communications are being intercepted. Upon information and belief, Defendants generate revenue from thousands of individuals who make purchases of products online throughout the 50 States (given its shipping policies), including in this District. By deriving revenue from consumers in the 50 States, this constitutes purposeful activity directed at individuals and their browsing devices in each of the 50 States. Defendants regularly promote and advertise their products in all 50 states.

31. Pursuant to 28 U.S.C. §1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## ARTICLE III STANDING

32. Plaintiffs all have Article III standing to pursue their claims. As an initial matter, the statutory claims pleaded by Plaintiffs below codify substantive rights to privacy. *See e.g., In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 598 (9th Cir. 2020) ("[T]he legislative history and statutory text demonstrate that Congress and the California legislature intended to protect these historical privacy rights when they passed the Wiretap Act, SCA, and CIPA."); *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117–18 (9th Cir. 2019) ("[T]he intrusion itself makes defendant subject to liability…wiretapping is actionable…a wiretapping plaintiff need not allege any further harm to have standing.").

33. Plaintiffs' claims arise under the core substantive provisions of the Federal Wiretapping Statute, Computer Fraud and Abuse Act, State Wiretapping statutes, and State

privacy, theft, trespass to chattels, conversion to chattels, and unfair competition statutes, and as such, confer standing.

34. The Third Circuit has agreed that the entry of personal or sensitive information while making purchases on Defendants' websites is sufficiently highly sensitive to cause harm closely analogous to that vindicated by the intrusion upon seclusion tort. *See In re BPS Direct, LLC; Cabela's LLC Wiretapping Litig.*, 174 F.4th 423, 433-34 (3d Cir. 2026).

35. The core provisions of the statutes pled below are targeted at the substantive intrusion that occurs when private communications are intercepted by someone who does not have the right to access them, rather than merely setting out a procedure for handling data.

36. Importantly, the Federal Wiretapping Statute and its analogous state counterparts are content-neutral laws of general applicability, whose primary purpose is to protect the privacy of wire, oral, and electronic communications by virtue of the fact that they were illegally intercepted i.e., "by virtue of the source rather than the subject matter." *Bartnicki v. Vopper*, 532 U.S. 514, 517 (2001).

37. In the counts pleaded herein, Plaintiffs plead statutes that codify a content-specific extension of the substantive right to privacy: these statutes protect Plaintiffs' substantive privacy interest in their Website Communications. Every interception and disclosure of Plaintiffs' Website Communications offends the interests that these statutes protect and constitutes a concrete injury.

38. Plaintiffs allege that Defendants procured Session Replay Providers to collect their data without consent and have violated the concrete privacy interests that the Federal Wiretapping Statute, Computer Fraud and Abuse Act, State Wiretapping statutes, and State privacy, theft, and unfair competition statutes, as well as the common law torts of invasion of privacy and intrusion upon seclusion, protect.

39.     Moreover, Plaintiffs allege that Defendants' procurement of Session Replay Providers to surreptitiously and instantaneously record every Website Communication is highly offensive and Plaintiffs have suffered concrete injury from Defendants' conduct.

40.     Plaintiffs allege specific facts demonstrating that the only reason Defendants have access to the aggregated data of Plaintiffs and Class Members is through the illegal collection and storage of information from Plaintiffs' Website Communications by third parties without consent. These allegations constitute concrete injuries under the substantive rights the statutes – and the common law torts - protect.

41.     That the information collected by third parties procured by Defendants was private Website Communications and was later used by Defendants, and by third parties, to facilitate their own products and services for financial gains also constitutes a concrete injury to Plaintiffs and Class Members.

42.     Plaintiffs also allege that the third parties procured by Defendants aggregate and store their data under unique identifiers. Thus, even if the individual data points gathered are anonymous by themselves, when aggregated, Session Replay Providers and Defendants use them to uniquely identify each user, creating a "fingerprint" for each individual, which supports a showing of concrete harm.

43.     Defendants have profited from Plaintiffs' Website Communications and have profited from the collection of Plaintiffs' data. All class members seek individual damages for these concrete injuries.

44.     Plaintiffs also allege that their Website Communications have monetary value for which they were not paid. Because statutes pleaded by Plaintiffs (UCL, for example) afford them the right to prevent Defendants and their Session Replay Providers from utilizing their data for

14

profit, they have a property interest in their data and have suffered an injury-in-fact by Defendants' collection, storage, use and sharing of Plaintiffs' private browsing information.

45.    In addition, Plaintiffs have Article III standing to pursue injunctive relief. To establish standing for prospective injunctive relief, a plaintiff must demonstrate "continuing, present adverse effects." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983).

46.    Plaintiffs desire to continue to use Defendants' Websites and to make purchases therein but Defendants' conduct is ongoing; Defendants continue to unlawfully cause the interception of the Website Communications of Plaintiffs and Class Members any time they visit Defendants' Websites with Session Replay Code enabled without their consent, and for any purchases they make. Defendants' conduct has not stopped, and they will continue to allow third parties to collect users' private browsing data, including, but not limited to, purchase data, for their own use without Plaintiffs' and Class Members' express consent.

47.    Plaintiffs have pled sufficient facts alleging concrete injuries for common law torts of invasion of privacy and intrusion upon seclusion, the Federal Wiretapping Statute, Computer Fraud and Abuse Act, State Wiretapping statutes, and State privacy, theft and unfair competition statutes.

## FACTUAL ALLEGATIONS

### A.    Website User and Usage Data Have Immense Economic Value

48.    The "world's most valuable resource is no longer oil, but data."[9]

49.    Last year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how

---

[9]    *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), *available at* https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last accessed July 15, 2026).

consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[10] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[11]

50.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[12]

51.     In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[13] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[14]

---

[10]     Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated Aug. 25, 2022), *available at* https://www.businessnewsdaily.com/10625-businesses-collecting-data.html (last accessed July 15, 2026).

[11]     *Id.*

[12]     Brad Brown, Kumar Kanagasabai, Prashant Pant & Gonçalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), *available at* https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data (last accessed July 15, 2026).

[13]     *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), *available at* https://www.oecd.org/en/publications/exploring-the-economics-of-personal-data_5k486qtxldmq-en.html (last accessed July 15, 2026).

[14]     *Id.* at 25.

52.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [*i.e.,* $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military are estimated to cost USD 55."[15]

**B.      Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Defendants' Websites**

53.     Consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[16]

54.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website hosts and not be shared with a third-party they know nothing about.[17] As such, website visitors reasonably expect that their interactions with a website should not be released to third-parties unless explicitly stated.[18]

---

[15]     *Id.*

[16]     Lance Whitney, *Data privacy is a growing concern for more consumers*, TECHREPUBLIC (Aug. 17, 2021), *available at* https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/ (last accessed July 15, 2026).

[17]     *CUJO AI Recent Survey Reveals U.S. Internet Users' Expectations and Concerns Towards Privacy and Online Tracking*, CUJO AI (May 26, 2020), *available at* https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html (last accessed July 15, 2026).

[18]     Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

55.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

56.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[19]

57.     Moreover, according to a study by Pew Research Center, a significant majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[20]

58.     Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software – which asks users for clear, affirmative consent before allowing companies to track users – 85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[21]

### C.     How Session Replay Code Works

59.     Session Replay Code, such as that implemented on Defendants' Websites, enables website operators to intercept, capture, read, observe, re-route, forward, redirect, record, save,

---

[19]     *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), *available at* https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last accessed July 15, 2026).

[20]     Brooke Auxier et al., *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), *available at* https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last accessed July 15, 2026).

[21]     Margaret Taylor, *How Apple screwed Facebook*, WIRED, (May 19, 2021), *available at* *https://www.wired.com/story/apple-ios14-facebook/* (last accessed July 15, 2026).

analyze and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with detailed insights into the user behavior by intercepting and recording website visitors "as they click, scroll, type or navigate across different web pages."[22]

60.    While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, has enabled private browsing such as "Incognito Mode" with the intention of masking their activities and information, or has not finished submitting the data to the website operator.[23] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[24]

61.    The Session Replay Code utilized by Defendants works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of communications initiated by the actions the user takes.[25] Simply

---

[22]    Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), *available at* https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/ (last accessed July 15, 2026).

[23]    *Id.*

[24]    Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), *available at* https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0 (last accessed July 15, 2026).

[25]    These communications occur through the Hypertext Transfer Protocol ("HTTP"). HTTP works as a request-response protocol between a user and a server as the user navigates a website. A GET request is used to request data from a specified source. A POST request is used to send

put, when a user interacts with the website, they transmit substantive information via electronic communications in the form of instructions to Defendants' computer servers utilized to operate the website. These commands are sent as messages instructing the website host, like Defendants, what content was being viewed, clicked on, requested and/or inputted by the user.

62.    When Defendants' Websites deliver Session Replay Code to a user's browser, the user's browser will follow the code's instructions by contemporaneously sending duplicated responsive messages of the user's communications, in the form of "Event" data, to a designated third-party Session Replay Provider server. Upon information and belief, the servers receiving the event data is exclusively controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

63.    The types of communications captured by the Session Replay Code utilized by Defendants encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entries, and numerous other forms of a user's navigation and interaction through Defendants' Websites. To permit a reconstruction of a user's visit accurately, the Session Replay Code is capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

64.    Unless specifically masked through configurations chosen by the website owner, visible contents of Website Communications are also transmitted to the Session Replay Provider.

---

data to a server. *See, e.g.*, *HTTP Request Methods, available at* https://www.w3schools.com/tags/ref_httpmethods.asp (last accessed July 15, 2026).

Upon information and belief, Defendants do not utilize any masking configuration settings available to them and thereby transmit all the captured data to their Session Replay Providers.

65.    Once the events from a user session have been recorded by a Session Replay Code, Defendants' procured Session Replay Providers store the raw data to be interpreted and reproduced so that Defendants can view a visual reenactment of the user's visit through the Session Replay Provider's proprietary service platform, usually in the form of a video, meaning that "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[26] Moreover, the raw event data is neither readily accessible or interpretable by Defendants themselves, instead it is in the custody and control of the Session Replay provider, who has the ability to interpret and replay the data.

66.    The following screenshots provide an example of a typical recording of a visit to a website captured utilizing the Session Replay Codes embedded by Defendants, which include mouse movements, keystrokes and clicks, search terms, content viewed, and personal information inputted by the website visitor:

**CLARITY**

---

[26]    Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), *available at* https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/ (last accessed July 15, 2026).

21



**QUANTUM METRIC**



**MOUSEFLOW**

22



67.      The extent and detail of the data collected by the Session Replay Providers for users

of the technology, such as Defendants, far exceeds the stated purpose and Plaintiffs' and the Class

Members' reasonable expectations when visiting websites like those of Defendant. Indeed, in a

patent dispute, a highly utilized Session Replay Provider openly admitted that this type of

technology is utilized by companies like Defendants to make a profit: "[the] software computes

billions of touch and mouse movements and transforms this knowledge into profitable actions that

increase engagement, reduce operational costs, and maximize conversion rates (i.e., the percentage

of users who take desired actions on a website, such as purchasing a product offered for sale)."[27]

68.      Further, because most Session Replay Codes will by default indiscriminately

capture the maximum range of user-initiated events and content displayed by the website,

researchers have found that a variety of highly sensitive information can be captured in event

responses from website visitors, including medical conditions, credit card details, and other

---

[27]      *Content Square SAS v. Quantum Metric, Inc.,* Case No. 1:20-cv-00832-LPS, Compl. ¶ 8 [DE 1] (D. Del. Jun. 22, 2020).

personal information displayed or entered on webpages. Upon information and belief, the Session Replay Code utilized by Defendants captures data including such highly sensitive information.

69. Most alarming, the Session Replay Code captures data that the user did not even intentionally transmit to a website during a visit, and then makes that data available to Defendants when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code will nevertheless cause the non-submitted text to be sent to the designated event-response-receiving Session Replay Provider's server before the user deletes the text or leaves the page. This information will then be viewable to Defendants when accessing the session replay through the Session Replay Provider.

70. Session Replay Code does not necessarily anonymize user sessions, either.

71. First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

72. Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

73. Third, some Session Replay Providers, including those utilized by Defendants, explicitly offer website owners functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[28]

---

[28]   *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited August 8, 2023); *FAQ - Are you able to follow user sessions across devices?*, Quantum Metric, https://www.quantummetric.com/faq/ (last visited August 8, 2023); *How does Mouseflow detect new and returning visitors?*, Mouseflow,

74.    Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

75.    When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

76.    In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[29] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [… . ] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[30] Moreover, users are deprived of their capacity to consent to the additional storage of their communications and personal information by a third-party.

---

https://help.mouseflow.com/en/articles/4361083-how-does-mouseflow-detect-new-and-returning-visitors (last visited August 8, 2023).

[29]    Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

[30]    Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

77.     The privacy concerns arising from Session Replay Code are not theoretical or imagined. The CEO and founder of LOKKER, a provider of data privacy and compliance solutions has said "[consumers] should be concerned" about the use of Session Replay Code because "they won't know these tools are operating 'behind the scenes' of their site visit" and "even if the company disclosed that they are using these tools, consumers wouldn't likely be able to opt-out and still use the site."[31] True to this statement, Defendants' Websites offer no opportunity to opt-out of its use of Session Replay Code, including if a user utilizes a private browsing mode on their browser.

78.     Indeed, the news is replete with examples of the dangers of Session Replay Code. For example, in 2019, the App Analyst, a mobile expert who writes about his analyses of popular apps, found that Air Canada's iPhone app wasn't properly masking the session replays they were sent, exposing unencrypted credit card data and password information.[32] This discovery was made just weeks after Air Canada said its app had a data breach, exposing 20,000 profiles.[33]

79.     Further, multiple companies have removed Session Replay Code from their websites after it was discovered the Session Replay Code captured highly sensitive information. For instance, in 2017, Walgreens stopped sharing data with a Session Replay Provider after it was discovered that the Session Replay Provider gained access to website visitors' sensitive

---

[31]     Mark Huffner, *Is 'session replay software' a privacy threat or just improving your web experience*, Consumer Affairs (Oct. 25, 2022), https://www.consumeraffairs.com/news/is-session-replay-software-a-privacy-threat-or-just-improving-your-web-experience-102522.html.

[32]     Zach Whittaker, *Many Popular iPhone Apps Secretly Record Your Screen Without Asking*, TechCrunch (Feb. 6, 2019), https://techcrunch.com/2019/02/06/iphone-session-replay-screenshots/.

[33]     *Id.*

26

information.[34] Indeed, despite Walgreens' extensive use of manual redactions for displayed and inputted data, the Session Replay Provider still gained access to full names of website visitors, their medical conditions, and their prescriptions.[35]

80.     Following the Walgreens incident, Bonobos, a men's clothing retailer, announced that it was eliminating data sharing with a Session Replay Provider after it was discovered that the Session Replay Provider captured credit card details, including the cardholder's name and billing address, and the card's number, expiration, and security code from the Bonobos' website.[36]

81.     Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[37] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[38]

82.     Consistent with Apple's concerns, countless articles have been written about the privacy implications of recording user interactions during a visit to a website, including the following examples:

---

[34]     Nitasha Tiku, *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, WIRED (Nov. 16, 2017), https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.

[35]     Englehardt, *supra* note 26.

[36]     Tiku, *supra* note 34.

[37]     Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.

[38]     *Id.*

(a) ***The Dark Side of 'Replay Sessions' That Record Your Every Move Online***, located at https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/ (last visited August 8, 2023);

(b) ***Session-Replay Scripts Disrupt Online Privacy in a Big Way***, located at https://www.techrepublic.com/article/session-replay-scripts-are-disrupting-online-privacy-in-a-big-way/ (last visited August 8, 2023);

(c) ***Are Session Recording Tools a Risk to Internet Privacy?***, located at https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/ (last visited August 8, 2023);

(d) ***Session Replay is a Major Threat to Privacy on the Web***, located at https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720 (last visited August 8, 2023);

(e) ***Session Replay Scripts Could be Leaking Sensitive Data***, located at https://medium.com/searchencrypt/session-replay-scripts-could-be-leaking-sensitive-data-5433364b2161 (last visited August 8, 2023);

(f) ***Website Owners can Monitor Your Every Scroll and Click***, located at https://www.digitalinformationworld.com/2020/02/top-brands-and-websites-can-monitor-your-every-scroll-and-click.html (last visited August 8, 2023); and

(g) ***Sites Using Session Replay Scripts Leak Sensitive User Data***, located at https://www.helpnetsecurity.com/2017/11/20/session-replay-data-leak (last visited August 8, 2023).

**D.    Defendants Secretly Wiretap and Procure Session Replay Providers to Wiretap their website visitors' Electronic Communications**

83.    Defendants BPS and Cabela's own, manage, and/or operate the websites www.basspro.com and www.cabelas.com, respectively. Defendants are online and brick-and-mortar retailers for outdoor products, such as hunting gear and apparel, and camping equipment.

84.    However, unbeknownst to the millions of individuals perusing Defendants' products online, Defendants intentionally procure and embed Session Replay Code from Session Replay Providers, such as Microsoft, Quantum Metric, and Mouseflow, on www.basspro.com and www.cabelas.com to track and analyze websites user communications with Defendants' Websites.

85.    Each of these Session Replay Codes used by Defendants provide detailed information about website user sessions, interactions, and engagement, with the capacity to break down users by device type, location, and other dimensions.[39]

86.    As such, the Session Replay providers collected and continue to collect Plaintiffs' and Class Members' highly personal information and substantive communications that can be tied directly to a website user's identity as it monitors, records, and collects a website user's every move.

87.    In order for Session Replay Code to capture website visitors' interactions with a website, the Session Replay Provider's JavaScript must be installed on the website, either directly hard-coded on the website or via a third-party platform, such as Google Tag Manager.[40] Microsoft

---

[39]    *See* Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Sep. 8, 2022); *Search for Recordings by a User's IP Address, Location, and Other Identifiers*, Mouseflow, https://help.mouseflow.com/en/articles/5882714-search-for-recordings-by-a-user-s-ip-address-location-and-other-identifiers (last visited August 8, 2023); *see also supra* note 28.

[40]    *Set Up Clarity*, Microsoft (Jul. 18, 2022), https://docs.microsoft.com/en-us/clarity/clarity-setup.

29

Clarity, Quantum Metric, and Mouseflow are embedded in Defendants' Websites by adding the relevant JavaScript code into the HyperText Markup Language (HTML) underlying Defendants' Websites. As with all HTML code, Session Replay Code is not visible to a user who is navigating a webpage through a standard browser's default view because by design a browser will interpret HTML, without showing it, in order to render a more user-friendly display that is the designer's intended presentation of the website to a visitor.

88.    The Session Replay Code on Defendants' Websites can be revealed to technical users who understand web technologies and can enable alternative display modes that will show underlying HTML, such as "developer tools," but even then, the users would first need to know what they are looking for to find the script. Developer tools are intended for website programmers, and are generally not meaningful or comprehensible by those without a background in computer science.

89.    Once Session Replay JavaScript was installed on Defendants' Websites, Microsoft, Quantum Metric, and Mouseflow began collecting website user's interactions, sometimes in as little as within two hours of installation.[41] Once properly installed and functional, the wiretapping commences immediately on the visitor's web browser when the visitor loads a website in their browser.

90.    Data collected by Session Replay Providers is then stored in the respective provider's servers and/or cloud service, where the provider retains access to that information in order to provide the session replay services through its platform.[42]

---

[41]    *Frequently Asked Questions*, Microsoft, https://docs.microsoft.com/en-us/clarity/faq, (last visited Aug. 24, 2022).

[42]    *Id.*

91.    Defendants' procurement and use of Session Replay Codes through various Session Replay Providers to collect Plaintiffs' and Class Members' Website Communications, constitutes wiretapping in violation of numerous states' statutes and common law..

**E.    Plaintiffs' and Class Members' Experiences**

**Plaintiff Cornell**

92.    While in Pennsylvania, Plaintiff Cornell visited www.basspro.com and certain of its subpages on her computer in July 2022. She browsed for different products for sale and communicated with BPS's website by using her mouse to hover and click on certain products and type search words into the search bar.

93.    During Plaintiff Cornell's visit, she ultimately purchased a Bass Pro Shops Eclipse Mesh-Back Canopy Chair in Cloisonne Blue. During this transaction, Plaintiff Cornell communicated with BPS by, *inter alia*, telling BPS what product she was interested in, what color chair she wanted, and where she wanted the chair shipped (i.e., her address and other personal information). In return, BPS communicated with Plaintiff Cornell by informing Plaintiff Cornell of the price of the product and requesting other information, including asking Plaintiff Cornell to provide certain information, including her name, address, and payment information. Plaintiff Cornell provided this information to BPS by using her keyboard to enter her name, address, and payment and billing information into form fields during the checkout process. Plaintiff Cornell viewed this information as highly sensitive.

94.    During Plaintiff Cornell's visit to BPS's website, Plaintiff Cornell, through her computer, transmitted electronic communications in the form of instructions to BPS's computer servers utilized to operate the website. The commands were sent as messages instructing BPS what content was being viewed, clicked on, requested and/or inputted by Plaintiff Cornell. The

31

communications sent by Plaintiff Cornell to BPS's servers included, but were not limited to, the following actions taken by Plaintiff Cornell while on the website: mouse clicks and movements, keystrokes, search terms, substantive personal, financial, and billing information inputted by Plaintiff Cornell, pages and content viewed by Plaintiff Cornell, scroll movement, and copy and paste actions.

95.    BPS responded to Plaintiff Cornell's electronic communications by supplying—through its website—the information requested by Plaintiff Cornell.

96.    Plaintiff Cornell reasonably expected that her visit to BPS's website would be private and that Defendants would not have procured a third party that was tracking, recording, and/or watching Plaintiff as she browsed, interacted with the website, and searched for products, particularly because Plaintiff was not presented with any type of pop-up disclosure, consent form, or privacy policy alerting Plaintiff Cornell that her visit to the website was being recorded by BPS through a third party.

97.    Defendants' data collection is highly offensive and Plaintiff Cornell has suffered concrete injury from Defendants' vast collection, aggregation and use of Plaintiff Cornell's personal browsing histories without consent.

**Plaintiff Montecalvo**

98.    While in Massachusetts, Plaintiff Montecalvo visited www.cabelas.com on his computer, smartphone, and iPad to search for hunting and fishing gear.

99.    Plaintiff Montecalvo has consistently visited Cabela's Websites between 2010 and through 2021. Specifically, since 2019, Plaintiff Montecalvo visited Cabela's website on his laptop, smart phone, and iPad, approximately one to three times each year while in Massachusetts.

100.    During some of Plaintiff Montecalvo's visits, he made multiple purchases, including for a RedHead Last Chance Light Duty Belt. During this transaction in particular, Plaintiff Montecalvo communicated with Cabela's by, *inter alia*, telling Cabela's what product he was interested in, what color belt he wanted, and where he wanted the belt shipped (i.e., his address and other personal information). In return, Cabela's communicated with Plaintiff Montecalvo by informing Plaintiff Montecalvo of the price of the product and requesting other information, including asking Plaintiff Montecalvo to provide certain information, including his name, address, and payment information. Plaintiff Montecalvo provided this information to Cabela's by using his keyboard to enter his name, address, and payment and billing information into form fields during the checkout process. Plaintiff Montecalvo viewed this information as highly sensitive.

101.    During Plaintiff Montecalvo's visits to Cabela's website, Plaintiff Montecalvo, through his computer and/or mobile device, transmitted electronic communications in the form of instructions to Defendant's computer servers utilized to operate the website. The commands were sent as messages instructing Defendants what content was being viewed, clicked on, requested and/or inputted by Plaintiff Montecalvo. The communications sent by Plaintiff Montecalvo to Cabela's servers included, but were not limited to, the following actions taken by Plaintiff Montecalvo while on the website: mouse clicks and movements, keystrokes, search terms, substantive personal, financial, and billing information inputted by Plaintiff Montecalvo, pages and content viewed by Plaintiff Montecalvo, scroll movement, and copy and paste actions.

102.    Cabela's responded to Plaintiff Montecalvo's electronic communications by supplying—through its website—the information requested by Plaintiff Montecalvo.

103.    Plaintiff Montecalvo reasonably expected that his visit to Cabela's website would be private and that Defendants would not have procured a third party that was tracking, recording,

and/or watching Plaintiff as he browsed, interacted with the website, and searched for products, particularly because Plaintiff was not presented with any type of pop-up disclosure, consent form, or privacy policy alerting Plaintiff Montecalvo that his visit to the website was being recorded by Cabela's through a third party.

104.    Defendants' data collection is highly offensive and Plaintiff Montecalvo has suffered concrete injury from Defendants' vast collection, aggregation and use of Plaintiff Montecalvo's personal browsing histories without consent.

**Plaintiffs' Experiences on Defendants' Websites**

105.    While visiting Defendants' Websites, Plaintiffs fell victim to Defendants' unlawful monitoring, recording, and collection of Plaintiffs' Website Communications with Defendants' Websites. Because, unbeknownst to Plaintiffs, Defendants procure and embed Session Replay Code on Defendants' Websites.

106.    Plaintiffs' and the Class Members' Website Communications were captured automatically and instantaneously by Session Replay Code and sent to various Session Replay Providers including Microsoft, Quantum Metric, and Mouseflow.

107.    Further, without Plaintiffs' consent, Defendants procured Session Replay Providers, including Microsoft, Quantum Metric, and Mouseflow to obtain certain information about their devices and browser, and create a unique ID and profile for them.

108.    This information would have included personal, financial, billing and purchase information for the purchases made by Plaintiffs.

109.    For example, when visiting Defendants' Websites to look at a product, that information is captured by the Session Replay Code embedded on the websites:



*Depicting information sent to one of the Service Replay Providers – Microsoft – through a Service Replay Code – Clarity – after viewing "LaCrosse Alpha Agility Waterproof Hunting Boots" while visiting* www.cabelas.com.



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after viewing "Vortex Diamondback HD Binoculars in TrueTimber Strata" while visiting www.basspro.com.*

110.    Similarly, when website users select a store closest to them in order to view inventory and schedule in-store pick-up, that information is sent to Service Replay Providers:



*Depicting information sent to one of the Service Replay Providers – Microsoft – through a Service Replay Code – Clarity – after selecting "Harrisburg" as "My Store" on www.cabelas.com.*



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after selecting "Harrisburg" as "My Store" on www.basspro.com.*

111.    The wiretapping by the Session Replay Code is ongoing during the visit and intercepts the contents of these communications between Plaintiffs and Defendants with instantaneous transmissions to the Session Replay Provider, as illustrated below, in which only 34

milliseconds were required to send a packet of event response data, which would indicate whatever

the website user had just done:



112. Thus, on multiple occasions when Plaintiffs visited Defendants' Websites, the

contents of their communications with Defendants' Websites were intercepted by Session Replay

Code, and simultaneously transmitted to Session Replay Providers, including Microsoft, Quantum

Metric, and Mouseflow.

113. The Session Replay Codes operate in the same manner for all putative Class

Members.

114. Like Plaintiffs, each Class member visited one or both of Defendants' Websites

with Session Replay Code embedded in them, and the Session Replay Code intercepted the Class

Members' Website Communications with Defendants' Websites by sending hyper-frequent logs

of those communications to Session Replay Providers.

115.    Even if Defendants mask certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

116.    For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

117.    As a specific example, if a user types a product into either Defendants' main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers will still learn what is entered into the bar as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Defendants will repeat the searched information back on the generated page. That information will not be masked even if user-input text is fully masked in a text field.

118.    The Session Replay Codes procured by Defendants are an electronic, mechanical, or other analogous device in that the Session Replay Code, monitors, collects, and records the content of electronic computer-to-computer communications between Plaintiffs' mobile computer and/or mobile device and the computer servers and hardware utilized by Defendants to operate their websites, subsequently interpreting that data to repurpose it into a Session Replay.

119.    Alternatively, even if the Session Replay Code itself were not a device, the Session Replay Codes are software designed to alter the operation of a website visitor's computer or mobile phone by instructing the hardware components of that physical device to run the processes that

ultimately intercept the visitor's communications and transmit them to the third-party Session Replay Provider, without the visitor's knowledge.

120.    The Session Replay Codes procured by Defendants are not website cookies, analytics tools, tags, web beacons, or other similar technologies. Instead, the data collected by the Session Replay Code identified specific information input and content viewed, and thus revealed personal and sensitive information about website visitors' internet activity and habits. As such, by the very nature of its operation, the Session Replay Code is a device used to intercept electronic communications.

121.    The Website Communications intentionally monitored, collected, and recorded by Session Replay Providers procured by Defendants was content generated through Plaintiffs' and Class Members' use, interaction, and communication with Defendants' Websites relating to the substance and/or meaning of Plaintiffs' and Class Members' communications with the websites, i.e., mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiffs and Class Members, and pages and content clicked on and viewed by Plaintiffs and Class Members. This information is "content" and is not merely record information regarding the characteristics of the message that is generated in the course of the communication, nor is it simply information disclosed in the referrer headers. The mere fact that Defendants value this content, and procures third parties to monitor, intercept and record it, confirms these communications are content that convey substance and meaning Defendants, and in turn, any Session Replay Provider that receives the intercepted information.

41

F.    **Plaintiffs and Class Members Did Not Consent to the Interception of Their Electronic Communications**

122.    Plaintiffs and Class Members did not provide prior consent to Defendants' interception of their Website Communications, nor could they, as the interception begins *immediately* upon arriving at Defendants' Websites.

123.    Defendants did not ask website visitors, including Plaintiffs and Class Members, for prior consent before wiretapping their Website Communications. Indeed, Plaintiffs and Class Members have no idea upon arriving at Defendants' Websites that Defendants are using Session Replay Code to allow third parties to monitor, collect, and record their Website Communications because the Session Replay Code is seamlessly incorporated and embedded into Defendants' Websites.

124.    Further, while Defendants may purport to maintain a singular "Privacy Policy" across both www.basspro.com and www.cabelas.com, the Privacy Policy is insufficient for Plaintiffs and Class Members to furnish prior consent. First, because the wiretapping begins the moment a website user visits Defendants' Websites, Plaintiffs and Class Members had no opportunity to review the Privacy Policy before they were wiretapped and therefore could not have opted out of or prevented the wiretapping before it occurred. Additionally, a reasonable person would not be on notice of the terms of Defendants' purported Privacy Policy by way of normal interaction with Defendants' Websites. Defendants' Privacy Policy is contained on the homepage of Defendants' Websites, in small low-contrasting font at the bottom of the webpages. As such, a reasonable person could browse for products on Defendants' Websites without ever being on notice of the purported Privacy Policy.

125.    Similarly, Plaintiffs and Class Members did not assent to the purported "Applicable Law/Jurisdiction" clause contained in Defendants' singular Privacy Policy across both

42

www.basspro.com and www.cabelas.com. At no point in time during a visit to Defendants' Websites and/or their subpages is a website visitor asked to agree or even view Defendants' Privacy Policy. Moreover, Defendants' Privacy Policy is contained on the homepage of Defendants' Websites, in small low-contrasting font at the bottom of the webpages. As such, a reasonable person could browse for products on Defendants' Websites without ever being on notice of the purported Privacy Policy and/or its "Applicable Law/Jurisdiction" clause.

126.    Finally, Plaintiffs and Class Members did not assent to the "Applicable Law/Jurisdiction" clause contained in Defendants' singular Terms of Use and Community Guidelines across both www.basspro.com and www.cabelas.com. At no point in time during a visit to Defendants' Websites and/or their subpages is a website visitor asked to agree or even view Defendants' Terms of Use and Community Guidelines. Moreover, Defendants' Terms of Use and Community Guidelines is contained on the homepage of Defendants' Websites, in small low-contrasting font at the bottom of the webpages. As such, a reasonable person could browse for products on Defendants' Websites without ever being on notice of the purported Terms of Use and Community Guidelines and and/or its "Applicable Law/Jurisdiction" clause.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Nationwide Class and State Subclasses:

**Nationwide Class:**

All natural persons in the United States whose Website Communications were captured in the United States through the use of Session Replay Code embedded in Defendants' Websites.

**Massachusetts Subclass:**

All natural persons in Massachusetts whose Website Communications were captured through the use of Session Replay Code embedded in Defendants' Websites

**Pennsylvania Subclass:**

All natural persons in Pennsylvania whose Website Communications were captured through the use of Session Replay Code embedded in Defendants' Websites

128. Excluded from the Nationwide Class and Subclasses are Defendants, their parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Nationwide Class and Subclasses, the judge to whom this case is assigned, and any immediate family members thereof, and the attorneys who enter their appearance in this action.

129. **Numerosity:** The members of the Nationwide Class and Subclasses are so numerous that individual joinder of all Class Members is impracticable. The precise number of Class Members and their identities may be obtained from the books and records of Defendants or the Session Replay Providers.

130. **Commonality:** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

    a.  whether Defendants procure Session Replay Providers to intercept Defendants' Websites' visitors' Website Communications;

    b.  whether Defendants intentionally disclose the intercepted Website Communications of their website users;

    c.  whether Defendants acquire the contents of website users' Website Communications without their consent;

    d.  whether Defendants' conduct violates Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*, Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*,

44

Massachusetts Wiretapping Statute, Mass. Gen. Laws ch. 272 §99(Q), or WESCA, 18 Pa. C.S.A. §§ 5701, *et seq.*,

e.  whether Plaintiffs and the Class Members are entitled to equitable relief; and

f.  whether Plaintiffs and the Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

131.  **Typicality:** Plaintiffs' claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiffs and each member of the Nationwide Class and Subclasses had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiffs and the members of the Class typical of one another.

132.  **Adequacy of Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Nationwide Class and Subclasses. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Nationwide Class and Subclasses, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Nationwide Class and Subclasses, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Nationwide Class and Subclasses.

133.  **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclass is impracticable. This proposed

45

class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

134.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiffs and each member of the Nationwide Class and Subclasses. If Defendants intercepted Plaintiffs' and Class Members' Website Communications, then Plaintiffs and each Class Member suffered damages by that conduct.

135.    **Ascertainability:** Members of the Nationwide Class and Subclasses are ascertainable. Class Membership is defined using objective criteria and Class Members may be readily identified through Defendants' books and records or the Session Replay Providers' books and records.

**COUNT I**
**VIOLATION OF FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, *et. seq*.**
**(On behalf of the Nationwide Class)**

136.    Plaintiffs, individually and on behalf of a Nationwide Class, repeat and reallege each and every allegation contained above as if fully alleged herein.

137.    The Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986, prohibits the intentional interception or attempted interception, or procurement of another for the interception, of any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

46

138.    The Wiretap Act further provides that any person who:

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1)(c) & (d).

139.    Defendants' transmission of Plaintiffs' and the Class Members' Website Communications to its Session Replay Provider(s) violates the Wiretap Act.

140.    The transmission from Plaintiffs and the Class Members to Defendant, and any deployed third-party Session Replay Provider, through Defendants' Websites are communications pursuant to 18 U.S.C. § 2510(12). "Electronic communication" means *any communication* made in whole or in part through the use of facilities for the transmission of communications by the signs, signals, writing or data between the point of origin and the point of reception. *Id.*

141.    "Interception" means "the acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents… include any information concerning the substance, purport, or meaning of that communication. 18 U.S.C.§ 2510(4), (8).

142.    "Content" is broadly defined and when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication 18 U.S.C.§ 2510(8). Plaintiffs' and the Class Members' URLs, web page address information, mouse clicks and movements, scrolling, zooms (out or in), and text

submissions (both partial and complete), including search terms or similar communications, were all collected by the Session Replay Code Defendants deployed on their websites. These constitute the contents of the electronic communications at issue.

143.    "Intercepting device" or the "Electronic, mechanical or other device" means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication. U.S.C.§ 2510(5). Here, Plaintiffs' and the Class Members' browsers and computing devices and Defendants' webservers, website, and the Session Replay Code Defendants deployed are all "devices" for the purposes of the Wiretap Act.

144.    By deploying and embedding the Session Replay Code on Defendants' Websites, Defendants intentionally violated the Wiretap Act, through its interception, attempt at interception, and its procurement of Session Replay Providers to intercept the content of Plaintiffs' and the Class Members' Website Communications.

145.    Defendants also willfully used or attempted to use the contents of Plaintiffs' and the Class Members' electronic communications, knowing that the information was obtained through unlawful interception. Defendants' use of Plaintiffs' and the Class Members' information and data for advertising, revenue generating benefits, and other unknown purposes, in the absence of express written consent, or any consent, is intentionally criminal and tortious where the conduct violates state laws, including but not limited to an unlawful invasion of privacy.

146.    Without Plaintiffs and Class Members' knowledge or consent, Defendants intercepted and procured Session Replay Providers, including Microsoft Clarity, Quantum Metric, and Mouseflow, to intercept the contents of their electronic communications when they navigated to the Defendants' Websites.

48

147.    Defendants intentionally used third parties' technology—the Session Replay Code—as a means of intercepting and acquiring the contents of Plaintiffs' and Class Members' electronic communications, including their purchase information. This violated the Wiretap Act in three primary ways. First, Session Replay Code captured and disclosed partial or unintentional text submissions to Defendants' Websites. These included communications Plaintiffs and the Class Members did not intend to send to Defendants or anyone. Second, by deploying the Session Replay Code, Defendants also procured another, the Session Replay Providers, to intercept the contents of Plaintiffs' and the Class Members Website Communications (both those intended for Defendants and not intended for Defendants) and disclosed those communications to unintended recipients to the communications (i.e., the third-party Session Replay Providers). Third, Defendants used the contents of Plaintiffs' and the Class Members' electronic communications after they were unlawfully intercepted, in violation of 18 U.S.C. § 2511(1), by Defendants and third-party Session Replay Providers for commercial gain. *See* 18 U.S.C. § 2511(1)(d).

148.    No party to the communication or consent exception applies to Defendants because Defendants' conduct falls outside the scope of these exceptions and the crime-tort exception to the exception applies. *See* 18 U.S.C. § 2511(2)(d). That Section states:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d).

149.    Criminal or tortious purposes include invading privacy, committing unfair business practices, committing or intent to commit trespass, or violating state computer crime laws. Defendants clearly had a criminal or tortious purpose for secretly installing and recording website

users with the Session Replay Code. This Complaint asserts state law claims for invasion of privacy. Additionally, each of the states the Plaintiffs are from have computer crime laws: Massachusetts, Mass.  and Pennsylvania, 18 Pa. C.S.A. §§ 7601 *et seq.*

150.    Defendants' primary purpose for deploying Session Replay Code was to secretly, without permission, collect data from users. The data Session Replay Code collected from users was all encompassing, including information that users never intended to send to Defendants and certainly never intended to send an unknown, third-party Session Replay Provider. This satisfies an intent to invade users' privacy and, additionally, an intent to violate various the Computer Fraud and Abuse Act and various state computer crime laws, which generally prohibit unauthorized access to computer data, systems, and networks.

151.    Defendants' interception of Plaintiffs' and the Class Members' data, and procurement of Session Replay Providers who also unlawfully intercepted Plaintiffs' and the Class Members' data, in a manner for which they lacked permission or consent violated the Wiretap Act. Additionally, Defendants' use of the data, after it had been unlawfully intercepted, namely associating the data with users' pre-existing online activity and using it to advertise, including for direct targeted advertisements based on Plaintiffs and Class Members, violated Section 2511(1)(d), a distinct violation of the Wiretap Act, and it and of itself satisfies Section 2511(2)(d)'s unlawful purpose exception.

152.    The Session Replay Providers also accessed Plaintiffs' and the Class Members' data, systems, and networks without their permission, authorization, or consent. This, too, is an unlawful interception under the Federal Wiretap Act. Defendants used the data the Session Replay Providers unlawfully intercepted for analysis and commercial gain, after it was intercepted. This

constitutes a distinct violation of Section 2511(1)(d), and one which falls outside the protections purported provided in Section 2511(2)(d).

153. Pursuant to 18 U.S.C. § 2511(5)(b), for violations of the Wiretap Act, the Court "may use any means within its authority to enforce an injunction issued under paragraph (ii)(A) and shall impose a civil fine of not less than $500 for each violation of the injunction. Additionally, 18 U.S.C. § 2520 provides that "any person whose wire, oral or electronic communication is intercepted, disclosed, or intentionally used in violation of Chapter 119, may recover from the person or entity that engaged in the violation in a civil action.

154. Plaintiffs and Class Members are persons whose electronic communications were intercepted within the meaning of Section 2520. As such, they are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual damages, punitive damages, and reasonable attorneys' fees and costs of suit.

**COUNT II**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (CFAA)**
**18 U.S.C. § 1030, _et seq_.**
**(On behalf Nationwide Class)**

155. Plaintiffs, individually and on behalf of a Nationwide Class, repeat and reallege each and every allegation contained above as if fully alleged herein.

156. The Plaintiffs' and the Class's computer and/or mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

157. Defendants exceeded, and continue to exceed, authorized access to the Plaintiffs' and the Class's protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

158.    Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of Plaintiffs' and the Class's private and personally identifiable data and content to undisclosed third parties—including the Website visitor's Electronic Communications with the website, including their finger or mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communication which were never intended for public consumption.

159.    Defendants' conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of Plaintiffs and the Class being made available to Defendant, the third-party vendor, and/or other third parties without adequate legal privacy protections.

160.    Accordingly, Plaintiffs and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

**COUNT III**
**VIOLATION OF MASSACHUSETTS WIRETAPPING STATUTE**
**Mass. Gen. Laws ch. 272 § 99(Q)**
**(On behalf of the Massachusetts Subclass)**

161.    Plaintiff Montecalvo ("Plaintiff," for purposes of this Count), individually and on behalf of the Massachusetts Subclass, repeats and realleges each and every allegation contained above as if fully alleged herein.

162.    Plaintiff and Class Members visited and interacted with Defendants' Websites from their personal computers and/or mobile devices while in Massachusetts.

163.    Unbeknownst to Plaintiff and Class Members, Defendants procure and direct Session Replay Providers to embed Session Replay Code on Defendants' Websites to

surreptitiously intercept, monitor and record nearly every interaction visitors have with their websites—including mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text submissions (both partial and complete), search queries, URLs of webpages visited, purchase-based communications, and other forms of a visitors' navigation and interaction with the websites ("Website Communications")—in real-time.

164.    The Massachusetts Wiretapping Statute (the "Massachusetts Statute") prohibits private corporations, like Defendants, from (1) willfully intercepting, or procuring another to intercept, any wire or oral communication; (2) disclosing the contents of any wire or oral communication; or (3) using the contents of any wire or oral communication, knowing that the information was obtained through interception. Mass. Gen. Laws ch. 272 § 99(B)(13) & (C).

165.    The Massachusetts Statute seeks to curtail "the uncontrolled development and unrestricted use of modern electronic surveillance," which the Massachusetts Legislature termed a "grave danger[] to the privacy of all citizens of the commonwealth." Mass. Gen. Laws ch. 272 § 99(A).

166.    Defendants' procurement and use of Session Replay Code violates the Massachusetts Statute, which provides a civil remedy for "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception[.]" Mass. Gen. Laws ch. 272 § 99(Q).

167.    In relevant part, "'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Mass. Gen. Laws ch. 272 § 99(B)(4) (emphasis added).

168.    "Wire Communication" is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." Mass. Gen. Laws ch. 272 § 99(B)(1).

169.    "Contents," when "used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." Mass. Gen. Laws ch. 272 § 99(B)(5).

170.    An "intercepting device" is broadly defined as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." Mass. Gen. Laws ch. 272 § 99(B)(3).

171.    Plaintiff and Class Members' Website Communications constitute "wire communications," within the meaning of the Massachusetts Statute. *See* Mass. Gen. Laws ch. 272 § 99(B)(1); *Commonwealth v. Moody*, 466 Mass. 196, 208 (2013) (definition of "wire communication" in the Massachusetts Statute is "broad[]" and encompasses "non-oral electronic transmissions"); *see also Alves v. BJ's Wholesale Club, Inc.*, No. 22-2509-BLS1, 2023 WL 4456956 (Mass. Super. June 21, 2023) ("The mouse movements, clicks, keystrokes, and other browsing activity that [Session Replay Code] records plausibly constitute an exchange of information between the website's owner and the website user.").

172.    The "contents" of Plaintiff and Class Members' Website Communications are captured and recorded by the Session Replay Code embedded on Defendants' Websites, within the meaning of the Massachusetts Statute. *See* Mass. Gen. Laws ch. 272 § 99(B)(5); *Commonwealth v. Mejia*, 64 Mass. App. Ct. 238, 243 (2005) ("'Contents' . . . is defined broadly")

(quoting *District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*, 379 Mass. 586, 591-92 (1980)). The data collected by the Session Replay Code includes specific information inputted and content viewed by visitors to Defendants' Websites and therefore reveals personalized and sensitive information about the website visitors' Internet activities, including the visitors' personal interests, browsing histories and search queries, as well as purchase-based information like credit card and billing information.

173.    Session Replay Code, like that procured and utilized by Defendants, is an "intercepting device" used for the "recording [of] wire . . . communication[s]" within the meaning of the Massachusetts Statute because it monitors, records, and collects the contents of electronic computer-to-computer communications relayed between the personal computers and/or mobile devices of website visitors and the computer servers and hardware utilized by Defendants to operate their websites. *See Rich v. Rich*, No. BRCV200701538, 2011 WL 3672059, at *6 (Mass. Super. July 8, 2011) (key logger program was an "intercepting device" under the Massachusetts Statute "because it is capable of . . . recording a wire . . . communication.") (quoting Mass. Gen. Laws ch. 272 § 99(B)(3)); *see also Alves v. BJ's Wholesale Club, Inc.*, No. 22-2509-BLS1, 2023 WL 4456956, at *5 (Mass. Super. June 21, 2023) (citing cases).

174.    Session Replay Code intercepts and captures the content of individual visitors' Website Communications in a manner that is far more active and invasive than other analytics tools like cookies, tags, or web beacons. The Session Replay Code procured and utilized by Defendants alters the operation of the personal computers and/or mobile devices used by website visitors by instructing the hardware components of those physical devices to run the processes that ultimately intercepts the Website Communications and transmits them contemporaneously to the

Session Replay Providers. By the very nature of its operation, the Session Replay Code is therefore an "intercepting device" within the meaning of the Massachusetts Statute.

175. The Session Replay Code procured and utilized by Defendants deliberately intercepts, records, and collects the content of Plaintiff's and Class Members' electronic communications with Defendants' Websites for the purpose of sending targeted marketing information, promotions, and advertisements to customers and potential customers in Massachusetts, including Plaintiff and Class Members. The data and information intercepted, recorded, and collected is used by Defendants to increase their marketing efficiency, advertising, and outreach efforts, rather than to keep the websites operational.

176. Defendants intentionally procure and embed Session Replay Code on their websites to spy on, automatically and secretly, and intercept the Website Communications of visitors to their websites, without their consent and in real-time.

177. Plaintiff's and Class Members' Website Communications are intercepted contemporaneously with their transmission.

178. Plaintiff and Class Members did not consent to having their Website Communications wiretapped.

179. Plaintiff and Class Members have been injured by Defendants' conduct alleged herein, which injury includes violations of their privacy and the unknowing loss of control over how their personal information and communications are received, used, or disseminated and by whom. Accordingly, the imposition of statutory damages under MWESA is appropriate here.

180. Pursuant to Mass. Gen. Laws ch. 272 § 99(Q), Plaintiffs and the Class Members seek (1) actual damages but not less than liquidated damages computed at the rate of $100 per day

56

for each day of violation or $1000, whichever is higher; (2) punitive damages; and (3) a reasonable attorneys' fee and other litigation disbursements reasonably incurred.

181.    Defendants' conduct is ongoing. Defendants continue to utilize Session Replay Code to unlawfully intercept, disclose, and use the contents of Plaintiff's and Class Members' Website Communications any time they visit Defendants' Websites, without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT IV**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**Mass. Gen. Laws ch. 214 § 1B**
**(On behalf of Massachusetts Subclass)**

182.    Plaintiff Montecalvo ("Plaintiff," for purposes of this Count), individually and on behalf of the Massachusetts Subclass, repeats and realleges each and every allegation contained above as if fully alleged herein.

183.    Massachusetts common law recognizes the tort of invasion of privacy. The right to privacy is also embodied by statute.

184.    Pursuant to Mass. Gen. Laws ch. 214 § 1B (the "Massachusetts Privacy Act"), "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."

185.    A claim asserting an invasion of privacy under the Massachusetts Privacy Act may be based on intrusion upon solitude or seclusion, *i.e.*, an infringement upon the right to be left alone. Mass. Gen. Laws ch. 214 § 1B ("The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.").

186.    Each time Plaintiff and Class Members visited Defendants' Websites on their personal computers and/or mobile devices, Defendants secretly monitored, recorded, and collected

57

their personal data, in real-time, for Defendants' monetary gain and without Plaintiff's and Class Members' consent.

187. Plaintiff's and Class Members' URLs, web page address information, mouse clicks and movements, scrolling, zooms (out or in), and text submissions (both partial and complete), including search terms or similar communications and purchase-related communications ("Website Communications"), were all collected by the Session Replay Code that Defendants procured and deployed on their websites.

188. Plaintiff and Class Members have an objective, reasonable expectation of privacy in their Website Communications.

189. Because the data collected by the Session Replay Code identifies specific information inputted and content viewed by visitors to Defendants' Websites, it reveals personalized and sensitive information about the website visitors' Internet activity, including the visitor's personal interests, search queries, and habits.

190. Defendants' surreptitious interception of website visitors' Website Communications therefore allowed Defendants to monitor, record, and disclose Plaintiff's and Class Members' personal interests, browsing histories, search queries, and habits as they interacted with and browsed Defendants' Websites in real-time.

191. Upon information and belief, the Session Replay Code embedded on Defendants' Websites indiscriminately captures the maximum range of data and information, including highly sensitive and personal information displayed by the websites.

192. Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendants could collect, disclose, or use the contents of their Website Communications.

58

193. Plaintiff and Class Members had an objective interest in conducting their personal activities without intrusion or interference and precluding the installation and embedding of the Session Replay Code on their devices for the purpose of disseminating and/or misusing their information and communications. This includes the right to not have their personal devices violated and personal information intercepted and utilized for business gain.

194. Defendants intentionally intrude on Plaintiff's and Class Members' private life, seclusion, or solitude, without consent.

195. Defendants' conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

196. Defendants deprived Plaintiff and Class Members of the right to control how their personal information and communications are received, used, or disseminated and by whom.

197. Plaintiff and Class Members were harmed by Defendants' wrongful conduct as Defendants' conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their personal information.

198. Defendants' conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure, and loss of privacy and confidentiality, has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

199. Additionally, given the monetary value of individual personal information, Defendants deprived Plaintiff and Class Members of the economic value of their interactions with Defendants' Websites, without providing proper consideration for Plaintiff's and Class Members' property.

59

200.    Further, Defendants have improperly profited from their invasion of Plaintiff's and Class Members' privacy by using Plaintiff's and Class Members' personal data and information for its economic value and Defendants' own commercial gain.

201.    Upon information and belief, Defendants derive significant benefit from the content intercepted through its procurement and use of Session Replay Code, by collecting, retaining, and using that data and information to maximize profits through predictive marketing and other targeted advertising practices.

202.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

203.    Defendants' conduct is ongoing. Defendants continue to unlawfully intercept the Website Communications of Plaintiffs and Class Members any time they visit Defendants' Websites with Session Replay Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT V
## VIOLATION OF PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT,
## 18 Pa. C.S.A. §§ 5701, *et seq*.
## (On behalf of the Pennsylvania Subclass)

204.    Plaintiff  Cornell ("Plaintiff," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, repeats and realleges each and every allegation contained above as if fully alleged herein.

205.    Plaintiff and Class Members visited and interacted with Defendants' Websites from their personal computers and/or mobile devices while in Pennsylvania.

206. Unbeknownst to Plaintiff and Class Members, Defendants procure and direct Session Replay Providers to embed Session Replay Code on Defendants' Websites to surreptitiously intercept, monitor and record nearly every interaction visitors have with their websites, in real-time. This includes purchase information.

207. WESCA makes it unlawful for private corporations, like Defendants, to (1) intentionally intercept, or procure another to intercept, any wire, electronic, or oral communication; (2) intentionally disclose the contents of any wire, electronic, or oral communication; or (3) intentionally use the contents of any wire, electronic, or oral communication, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. C.S.A. § 5703.

208. Defendants' procurement and use of the Session Replay Code violates WESCA, which provides a civil remedy for "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used[.]". 18 Pa. C.S.A. § 5725(a).

209. The Website Communications of visitors to Defendants' websites—including mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text submissions (both partial and complete), search queries, URLs of webpages visited, purchase-based communications, and other forms of a visitors' navigation and interaction with the websites—are intentionally intercepted by the Session Replay Code procured and utilized by Defendants in violation WESCA.

210. "Intercept" is defined as any "[a]ural or other acquisition of the contents of *any wire, electronic or oral communication* through the use of *any electronic, mechanical or other device*." 18 Pa. C.S.A. § 5702 (emphasis added).

211.    "Electronic Communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. C.S.A. § 5702.

212.    "Contents," when "used with respect to [] electronic [] communication[s], is any information concerning the substance, purport, or meaning of that communication." 18 Pa. C.S.A. § 5702.

213.    Plaintiff's and Class Members' intercepted Website Communications constitute the "contents" of "electronic communications" within the meaning of WESCA. Because the data collected by the Session Replay Code identifies specific information inputted and content viewed by visitors to Defendants' Websites, it reveals personalized and sensitive information about the website visitors' Internet activity, including the visitor's personal interests, search queries, and habits. As such, Defendants intercept the "content" generated through Plaintiff's and Class Members' intended use, interaction, and electronic communication with Defendants' Websites.

214.    The Session Replay Code procured and utilized by Defendants is a "device" used for the "acquisition of the contents of [] electronic [] communication[s]" within the meaning of WESCA, because it intercepts, monitors, records, and collects the contents of electronic computer-to-computer communications relayed between the personal computers and/or mobile devices of website visitors and the computer servers and hardware utilized by Defendants to operate their websites. Moreover, the Session Replay Code procured and utilized by Defendants alters the operation of the personal computers and/or mobile devices used by website visitors by instructing the hardware components of those physical devices to run the processes that ultimately intercepts the Website Communications and transmits them contemporaneously to the Session Replay Providers. By the very nature of its operation, the Session Replay Code is therefore a "device"

62

used to intercept electronic communications within the meaning of WESCA. Alternatively, Plaintiff's hardware is the "device" controlled by the Session Replay Code used to intercept electronic communications within the meaning of WESCA.

215.    Defendants violated WESCA by intentionally procuring and deploying Session Replay Code on their websites to spy on visitors, automatically and secretly, and *intercept* the content of Plaintiff's and Class Members' electronic communications with Defendants' Websites in real-time.

216.    Plaintiff's and Class Members' electronic communications are intercepted contemporaneously with their transmission.

217.    The Session Replay Code procured and utilized by Defendants also *discloses* the content of Plaintiff's and Class Members' electronic communications to the Session Replay Providers, who could then use the intercepted electronic communications to recreate simulation videos of Plaintiff's and Class Members' entire visits to Defendants' Websites.

218.    Defendants intentionally *use* the contents of Plaintiff's and Class Members' electronic communications, knowing that the data and information was obtained through unlawful interception, for purposes of targeted advertising, marketing, and other unknown revenue generating purposes. The Session Replay Code procured and utilized by Defendants deliberately intercepts, records, and collects the content of Plaintiff's and Class Members' electronic communications with Defendants' Websites for the purpose of sending targeted marketing information, promotions, and advertisements to customers and potential customers in Pennsylvania, including Plaintiff and Class Members. The data and information intercepted, recorded, and collected is used by Defendants to increase their marketing efficiency, advertising, and outreach efforts, rather than to keep the websites operational.

219.    Plaintiff and Class Members did not consent to Defendants' surreptitious interception and recording of their Website Communications, nor could they, as the interception begins *immediately* upon arriving at Defendants' websites.

220.    Plaintiff and Class Members have been injured by Defendants' conduct alleged herein, which injury includes violations of their privacy and the unknowing loss of control over how their personal information and communications are received, used, or disseminated and by whom. Accordingly, the imposition of statutory damages under WESCA is appropriate here.

221.    Pursuant to 18 Pa. C.S.A. 5725(a), Plaintiff and Class Members seek (1) actual damages, not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

222.    Defendants' conduct is ongoing. Defendants continue to procure and utilize Session Replay Code to unlawfully intercept, record, collect, disclose, and use the contents of electronic communications generated by website visitors—including Plaintiff and Class Members—any time they visit Defendants' Websites with Session Replay Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT VI
## INVASION OF PRIVACY – PENNSYLVANIA INTRUSION UPON SECLUSION
### (On behalf of the Pennsylvania Subclass)

223.    Plaintiff Cornell ("Plaintiff," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, repeats and realleges each and every allegation contained above as if fully alleged herein.

224. Pennsylvania common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in multiple sections of the Pennsylvania constitution.

225. Each time Plaintiff and Class Members visited Defendants' Websites on their personal computers and/or mobile devices, Defendants secretly monitored, recorded, and collected their personal data, in real-time, for Defendants' monetary gain and without Plaintiff's and Class Members' consent.

226. Plaintiff and Class Members' URLs, web page address information, mouse clicks and movements, scrolling, zooms (out or in), and text submissions (both partial and complete), including search terms or similar communications and including purchase-based communications ("Website Communications"), were all collected by the Session Replay Code that Defendants procured and deployed on their websites.

227. Plaintiff and Class Members have an objective, reasonable expectation of privacy in their Website Communications.

228. Because the data collected by the Session Replay Code identifies specific information inputted and content viewed by visitors to Defendants' Websites, it reveals personalized and sensitive information about the website visitors' Internet activity, including the visitor's personal interests, search queries, and habits.

229. Defendants' surreptitious procurement and interception of website visitors' Website Communications therefore allowed Defendants to monitor, record, and disclose Plaintiff's and Class Members' personal interests, browsing histories, search queries, and habits as they interacted with and browsed Defendants' Websites in real-time.

230.    Upon information and belief, the Session Replay Code embedded on Defendants' Websites indiscriminately captures the maximum range of data and information, including highly sensitive and personal information displayed by the websites.

231.    Plaintiff and Subclass Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendants could collect, disclose, or use the contents of their Website Communications.

232.    Plaintiff and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

233.    Defendants intentionally intrude on Plaintiff's and Class Members' private life, seclusion, or solitude, without consent.

234.    Defendants' conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

235.    Defendants deprived Plaintiff and Class Members of the right to control how their personal information and communications are received, used, or disseminated and by whom.

236.    Plaintiff and Class Members were harmed by Defendants' wrongful conduct as Defendants' conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their personal information.

237.    Defendants' conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

238.    Additionally, given the monetary value of individual personal information, Defendants deprived Plaintiff and Class Members of the economic value of their interactions with Defendants' Websites, without providing proper consideration for Plaintiff and Class Members' property.

239.    Further, Defendants have improperly profited from their invasion of Plaintiff's and Class Members' privacy by using Plaintiff's and Class Members personal data and information for its economic value and Defendants' own commercial gain.

240.    Upon information and belief, Defendants derive significant benefit from the content intercepted through its procurement and use of Session Replay Code, by collecting, retaining, and using that data and information to maximize profits through predictive marketing and other targeted advertising practices.

241.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

242.    Defendants' conduct is ongoing. Defendants continue to unlawfully procure the interception and to unlawfully intercept the Website Communications of Plaintiff and Class Members any time they visit Defendants' Websites with Session Replay Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT VII**
**TRESPASS TO CHATTELS**
**(On Behalf of Plaintiffs and the Nationwide Class, or in the alternative the Subclasses)**

243.    Plaintiffs repeat and reallege each and every allegation contained above as if fully alleged herein. For purposes of this Count, "Plaintiffs and the Classes" means Plaintiffs and the

67

Nationwide Class, or, in the alternative, the Pennsylvania and Massachusetts Subclasses.

244. Plaintiffs and the Classes owned, possessed, and/or had a right to possess Plaintiffs' devices (i.e., their mobile device or computer) and/or the data contained therein.

245. Plaintiffs' and Class Members' devices are chattel in that the devices are tangible, movable, and transferable.

246. Plaintiffs' and Class Members' data is also valuable chattel that is tangible or intangible and is movable and transferrable.

247. As set forth above, Defendants intentionally, directly or through a third party, interfered with; intermeddled with; used; took; transferred from Plaintiffs and the Classes; and/or exercised control or authority inconsistent with Plaintiffs' and Class Members' use and/or possession of the data contained on Plaintiffs' devices as described above.

248. As to the devices, Defendants used Plaintiffs' and Class Members' devices by causing a third party to place Session Replay Code directly on Plaintiffs' and the Classes devices for the purpose of tracking all of the user's interactions with the website that it wouldn't have been able to track had it not placed the Session Replay Code on the device and engaged in this surreptitious tracking. Defendants caused a third party to transfer Plaintiffs' data from Plaintiffs' devices to the Cloud Storage Data Centers of the Session Replay Providers. Defendants exercised control or authority inconsistent with Plaintiffs' and Class Members' use and/or possession of the devices by placing the Session Replay Code to stalk users of their websites.

249. As to the data, Defendants used Plaintiffs' and Class Members' data by transferring it from Plaintiffs' device to the Cloud Storage Data Centers of the Session Replay Providers for the purpose of using the data to make money without paying for it. Defendants exercised control or authority inconsistent with Plaintiffs' and Class Members' use and/or possession of the data by

capturing, taking, and/or using the data without permission or consent from Plaintiffs and the Classes.

250.    Plaintiffs' data that was transferred from Plaintiffs' and Class Members' respective devices are maintained in cloud storage devices located on servers across the nation.

251.    For example, Clarity data is stored in the Microsoft Azure cloud service.[43] The Azure Cloud Data Center locations (which host their services) are located across the United States and elsewhere.[44]

252.    Microsoft provides the following only regarding the Azure cloud service it offers to Session Replay Providers:

> As a customer, you *maintain ownership of customer data*—the content, personal and other data you provide for storing and hosting in Azure services. You are also in control of any additional geographies where you decide to deploy your solutions or replicate your data."[45]

253.    Quantum Metric stores data on the Google Cloud Platform.[46] Google Cloud is located in 9 locations in the US alone.[47] Google represents:

> Rather than storing each user's data on a single machine or set of machines, we distribute all data — including our own — across many computers in different locations.[48]

---

[43]    https://learn.microsoft.com/en-us/clarity/faq

[44]    https://datacenterlocations.com/microsoft-azure/#USA

[45]    https://azure.microsoft.com/en-us/explore/global-infrastructure/data-residency/#overview (emphasis added).

[46]    https://www.quantummetric.com/platform-foundations/data-privacy-security/

[47]    https://cloud.google.com/about/locations#americas

[48]    *See* https://www.google.com/about/datacenters/data-security/

254. As such, Plaintiffs' and Class Members' data is tied to something tangible – i.e., Microsoft Azure and/or Google Servers.

255. All Session Replay Providers operate in a similar manner with cloud devices and servers.

256. Plaintiffs and the Classes did not consent to the aforementioned intermeddling and/or interference.

257. The aforementioned intermeddling and/or interference was the actual and proximate cause of injury to Plaintiffs and the Classes because it exposed their respective private data and/or personally identifiable information and/or other data to one or more third parties.

258. Additionally, the interference gave third parties the data and information without the consent of Plaintiffs and the Classes and which is valuable and for which Defendants did not obtain informed consent nor pay Plaintiffs or the Classes to obtain.

259. Plaintiffs and the Classes members are entitled to recover the actual damages they suffered as a result of Defendants' aforementioned interference with their respective computer and/or mobile devices in an amount to be determined at trial.

## COUNT VIII
## CONVERSION TO CHATTELS
**(On Behalf of Plaintiffs and the Nationwide Class, or in the alternative the Subclasses)**

260. Plaintiffs repeat and reallege each and every allegation contained above as if fully alleged herein. For purposes of this Count, "Plaintiffs and the Classes" or "Plaintiffs and Class Members" means Plaintiffs and the Nationwide Class, or, in the alternative, the Pennsylvania and Massachusetts Classes.

261. Plaintiffs and the Classes owned, possessed, and/or had a right to possess Plaintiffs' devices (i.e., their mobile device or computer) and/or the data contained therein.

262. Plaintiffs' and Class Members' devices are chattel in that the devices are tangible, movable, and transferrable.

263. Plaintiffs' and Class Members' data is also valuable chattel that is tangible or intangible and is movable and transferrable.

264. As set forth above, Defendants intentionally, directly or through a third party, interfered with; intermeddled with; used; took; transferred from Plaintiffs and the Classes; and/or exercised control or authority inconsistent with Plaintiffs' and Class Members' use and/or possession of the data contained on Plaintiffs' devices as described above.

265. As to the devices, Defendants used Plaintiffs' and Class Members' devices by placing Session Replay Code directly on Plaintiffs' and the Classes devices for the purpose of tracking all of the user's interactions with the website that it wouldn't have been able to track had it not placed the Session Replay Code on the device and engaged in this surreptitious tracking. Session Replay Code embedded by Defendants transferred from Plaintiffs' device Plaintiffs' data to the Cloud Storage Data Centers of the Session Replay Providers. Defendants exercised control or authority inconsistent with Plaintiffs' and Class Members' use and/or possession of the devices by placing the Session Replay Code to stalk users of their websites.

266. As to the data, Defendants used Plaintiffs' and Class Members' data by transferring it from Plaintiffs' device Plaintiffs' data to the Cloud Storage Data Centers of the Session Replay Providers for the purpose of using the data to make money without paying for the valuable data. Defendants exercised control or authority inconsistent with Plaintiffs' and Class Members' use and/or possession of the data by capturing, taking, and/or using the data without permission or consent from Plaintiffs and the Classes.

267. Plaintiffs' data that was transferred from Plaintiffs' and Class Members' respective

71

devices are maintained in cloud storage devices located on servers across the nation.

268.    As noted and for example, Clarity data is stored in the Microsoft Azure cloud service.[49] The Azure Cloud Data Center locations (which host their services) are located across the United States and elsewhere.[50]

269.    Microsoft provides the following only regarding the Azure cloud service it offers to Session Replay Providers:

> As a customer, you *maintain ownership of customer data*—the content, personal and other data you provide for storing and hosting in Azure services. You are also in control of any additional geographies where you decide to deploy your solutions or replicate your data.[51]

270.     Quantum Metric stores data on the Google Cloud Platform.[52] Google Cloud is located in 9 locations in the US alone.[53] Google represents:

> Rather than storing each user's data on a single machine or set of machines, we distribute all data — including our own — across many computers in different locations.[54]

271.    As such, Plaintiffs' and Class Members' data is tied to something tangible – i.e., Microsoft and/or Google Servers.

272.    All Session Replay Providers operate in a similar manner with cloud devices and servers.

---

[49]    *See supra* note 43.

[50]    *See supra* note 44.

[51]    *See supra* note 45.

[52]    *See supra* note 46.

[53]    *See supra* note 47.

[54]    *See supra* note 48.

273.    As set forth above, Defendants exercised dominion and ownership over Plaintiffs' and Class Members' personalty inconsistent with, and in denial of, the rights of Plaintiffs' and the Classes.

274.    Plaintiffs and the Classes did not consent to the aforementioned interference.

275.    The aforementioned interference was the actual and proximate cause of injury to Plaintiffs and the Classes because it exposed their respective private data and/or personally identifiable information and/or other data to one or more third parties.

276.    Additionally, the interference gave third parties the data and information without the consent of Plaintiffs and the Classes, and which is valuable, and for which Defendants did not obtain informed consent nor pay Plaintiff or the Classes to obtain.

277.    Plaintiffs and the Classes are entitled to recover the actual damages they suffered as a result of Defendants' aforementioned interference with their respective devices and/or data in an amount to be determined at trial.

## <u>REQUEST FOR RELIEF</u>

Plaintiffs, individually and on behalf of the other members of the proposed Classes, respectfully request that the Court enter judgment in Plaintiffs' and Class Members' favor and against Defendants as follows:

A.    Certifying the Nationwide Class and State Subclasses and appointing Plaintiffs as the representatives of the Classes;

B.    Appointing Plaintiffs' counsel as class counsel;

C.    Declaring that Defendants' past conduct was unlawful, as alleged herein;

D.    Declaring Defendants' ongoing conduct is unlawful, as alleged herein;

73

E.      Enjoining Defendants from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.      Awarding Plaintiffs, the Nationwide Class, and State Subclass Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.      Awarding Plaintiffs, the Nationwide Class Members, and State Subclass Members pre-judgment and post-judgment interest;

H.      Awarding Plaintiffs, the Nationwide Class Members, and State Subclass Members reasonable attorneys' fees, costs, and expenses; and

I.      Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Classes, demand a trial by jury of any and all issues in this action so triable of right.

Date: <u>July 15, 2026</u>                    By: <u>*/s/ Kate M. Baxter-Kauf*</u>
                                            Kate M. Baxter-Kauf
                                            Karen Hanson Riebel
                                            Maureen Kane Berg
                                            **LOCKRIDGE GRINDAL NAUEN PLLP**
                                            100 Washington Avenue South, Suite 2200
                                            Minneapolis, MN 55401
                                            Tel: (612) 339-6900
                                            kmbaxter-kauf@locklaw.com
                                            khriebel@locklaw.com
                                            mkberg@locklaw.com

                                            Nicholas A. Colella (PA Bar # 332699)
                                            Gary F. Lynch (PA Bar # 56887)
                                            Kelly K. Iverson (PA Bar # 307175)
                                            Jamisen Etzel (PA Bar # 311514)
                                            Patrick Donathen (PA Bar # 330416)
                                            **LYNCH CARPENTER, LLP**
                                            1133 Penn Avenue, 5th Floor
                                            Pittsburgh, PA 15222
                                            Tel: (412) 322-9243
                                            NickC@lcllp.com
                                            Gary@lcllp.com
                                            Kelly@lcllp.com
                                            Jamisen@lcllp.com
                                            Patrick@lcllp.com

                                            Joseph H. Kanee
                                            **MARCUS & ZELMAN LLC**
                                            1508 SW 23 Street
                                            Fort Lauderdale, FL 33315
                                            Tel: (848) 346-4358
                                            joseph@marcuszelman.com

                                            Ari H. Marcus (PA Bar # 322283)
                                            **MARCUS & ZELMAN LLC**
                                            701 Cookman Avenue, Suite 300
                                            Asbury Park, NJ 07712
                                            Tel: (732) 695-3282
                                            ari@marcuszelman.com

                                            *Plaintiffs' Interim Co-Lead and Liaison Counsel*

75

Joseph P. Guglielmo
Ethan S. Binder
**SCOTT & SCOTT, ATTORNEYS AT LAW, LLP**
230 Park Avenue
24th Floor
New York, NY 10169
Tel: (212) 223-6444
jguglielmo@scott-scott.com
ebinder@scott-scott.com

MaryBeth V. Gibson
**GIBSON CONSUMER LAW GROUP, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA  30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

Steven M. Nathan
**HAUSFELD LLP**
33 Whitehall Street Fourteenth Floor
New York, NY 10004
Tel: (646) 357-1100
snathan@hausfeld.com

James J. Pizzirusso (Md. Bar No. 20817)
**HAUSFELD LLP**
1200 17th Street N.W. Suite 600
Washington, D.C. 20036
(202) 540-7200
jpizzirusso@hausfeld.com